CITY OF FT. WORTH v. YOUNG et al.
(No. 8353.)

(Court of Civil Appeals of Texas. Ft. Worth. March 25, 1916. Rehearing Denied April 22, 1916.)

1. NEW TRIAL ⬅56—IMPROPER DOCUMENTS IN JURY ROOM.

A pleading in another suit, not offered in evidence, having in contravention of Rev. St. art. 1957, found its way into the jury room, and influenced one juror, at least, to agree to a higher award for land condemned than he otherwise would, new trial should be granted.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 116–119; Dec. Dig. ⬅56.]

2. APPEAL AND ERROR ⬅978(3)—REVIEW—DENIAL OF NEW TRIAL.

While the matter of refusing a new trial because of documents not introduced in evidence having been taken into the jury room and considered by the jury is largely in the discretion of the trial court, such discretion is not an arbitrary one so as to be beyond the revision of the appellate court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3870; Dec. Dig. ⬅978(3).]

Appeal from District Court, Tarrant County; Marvin H. Brown, Judge.

Suit by Mrs. Ella Young and others against the City of Ft. Worth. Judgment for plaintiff, new trial denied, and defendant appeals. Reversed and remanded for new trial.

T. A. Altman and A. B. Curtis, both of Ft. Worth, for appellant. Flournoy, Smith & Storer, of Ft. Worth, for appellees.

CONNER, C. J. This suit was brought by Mrs. Young and others in the Sixty-Seventh district court of Tarrant county, Tex., on the 28th day of July, 1913, against the city of Ft. Worth, wherein complaint is made of damages resulting on account of the construction and completion of a large dam on the west fork of the Trinity river, which resulted in the backing up of water from said dam and overflowing plaintiff's lands. The case was tried on an amended petition filed in this cause on the 11th day of January, 1915. In said petition it was alleged that plaintiff owned about 1,200 acres of land, a large portion of which bordered on the west fork of the Trinity river, the entire tract consisting in the main of river bottom land; that the erection by the said city of its dam crossing the Trinity river a few miles below the land owned by plaintiff caused the water to back up and submerge a large portion of plaintiff's land, which in another clause of said petition was set out and described by metes and bounds. Plaintiff further alleged that the reasonable and fair market value of the land so appropriated by defendant city was, at the time of the appropriation, of a value of $100 per acre. It was further alleged and shown in said petition that the land actually submerged, and the land which the city actually sought to and had converted to its own use, consisted of 360.7 acres; that said land so appropriated was located in the Trinity river bottom, and that by reason of such appropriation on the part of said city of said bottom land, and because of the construction of the dam, and the consequent formation of a large body of water immediately adjacent and adjoining the land owned by plaintiff and not submerged, such uplands left remaining to plaintiff were damaged in the sum of $18 per acre; that said uplands consist of about 839.3 acres.

Plaintiff also alleged, and this was not controverted, that on the 7th day of February, 1914, the city of Ft. Worth, as principal, and the Southwestern Surety Insurance Company, as surety, had executed and filed in this cause their certain bond in writing wherein the said city, as principal, and said security company, as surety, promised and bound themselves to pay plaintiff in full, satisfy, and perform whatever judgment and decree might be rendered in plaintiff's favor in this cause against the city of Ft. Worth for damages for the taking or condemnation of the lands of plaintiff desired by the city for reservoir purposes and involved in this cause, including all costs of suit.

The defendant city to this petition filed a general demurrer, general denial, and special answer, alleging, among other things, that the

land which had been appropriated was not of a reasonable value in excess of $30 per acre. Defendant admitted in its first amended original answer that it had appropriated and used for reservoir purposes lands belonging to plaintiff, the same being necessary for the completion of a waterworks system for said city of about 360.7 acres. Defendant admits also that the water backed up from the dam constructed by said city did overflow and submerge the bottom land owned by plaintiff, and denied that said land was worth in excess of $30 per acre, and alleged that by reason of being contiguous to said reservoir, alleged to be a magnificent body of water, said remaining lands, referred to as uplands, were not damaged, but that the value thereof had been enhanced.

To said amended answer of defendant city, plaintiff filed a reply, in which denial was made of the allegations in said answer, and in which it was again alleged that the value of the land actually taken for reservoir purposes, consisting of 360.7 acres, was of a market value of about $100 per acre, and that the remaining land not actually appropriated had been damaged in respect to its market value to the extent of $18 per acre.

The case was tried before a jury, and the cause submitted upon special issues in which the jury were directed to find the reasonable market value of 360.7 acres appropriated by the city for reservoir purposes on February 1, 1912. In answer to this question, the jury fixed the valuation at $75 per acre. Another issue was with reference to the damage to the uplands, consisting of 839.3 acres, and in reply to this question the jury answered $9 per acre.

In accordance with the verdict of the jury, and upon motion of plaintiff, judgment was rendered in favor of plaintiff against the city of Ft. Worth, as principal, and the Southwestern Surety Insurance Company, as surety, in the total sum of $39,867.88, with interest on said sum at the rate of 6 per cent. per annum from April 28, 1915, from which judgment the defendant has duly prosecuted this appeal.

[1] The appellant first insists that the trial court committed error in overruling its motion for a new trial, in that:

"During the consideration of the verdict by the jury, certain improper and prejudicial matters which were not in evidence were communicated to the jurors, consisting of a certain petition or answer filed in an injunction suit involving the same property involved in this suit, but not being a pleading in this case, submitted to the jury as such, which document was read by a juror, W. W. Manning, and was read and discussed by other jurors; that said document was also read by a juror, J. F. Wise, and that it contained a statement to the effect that the defendant herein had not paid exceeding $75 per acre for any land that it had acquired in said reservoir site; but that, as a matter of fact, this defendant did not pay more than $50 per acre for any land that it acquired by voluntary purchase in said reservoir site; that said statement, which was probably intended to mean that this defendant had not paid more than $75 per acre for any lands that it had acquired in said reservoir site by condemnation, or arbitration, was misleading, and that the jurors thought that said statement meant that this defendant purchased lands in said reservoir site at the price of $75 per acre; that said statement was considered and discussed by said jurors before they agreed on their verdict, and at the time of said discussion at least two of the jurors favored a verdict of $50 per acre for the 360.7 acres belonging to plaintiff, taken by the defendant, and that said statement in said document did affect the verdict rendered by said jury, and caused the jury to render a verdict in excess of what would have been rendered, if they had not seen said statement; that Mr. Farmer, the foreman of the jury, made a statement in the presence of the jury which was construed by certain jurors to mean that he arrived at his verdict from personal knowledge of the value of the land in controversy, which statement this defendant alleged to have been true."

The motion was supported by the following affidavit of the juror Wise submitted to the court with the motion:

"That he was one of the jurors in the case of Mrs. Ells Young et al. v. City of Ft. Worth, in the Sixty-Seventh district court of Tarrant county, Texas; said case being No. 35508, which was tried during the month of April, 1915; that after he had heard all the evidence and the charge of the court and the argument of counsel, and after he, with the remainder of the jury, had retired to the jury room for consideration of their verdict, from the evidence and the charge of the court he had decided firmly that he would not vote for a verdict exceeding $50 per acre for the 360.7 acres of land belonging to the plaintiffs in said cause and taken by the defendant for reservoir purposes, and that he would not vote for more than $2 per acre damages to the remaining uplands belonging to said plaintiffs; that he firmly believed from the evidence and the charge of the court that said above-mentioned amounts were all that plaintiffs were entitled to; that on the first ballot the jury he voted for the allowance of $35 per acre for said 360.7 acres; that the jury considered their verdict all during the morning, that they were out, and that he never at any time during said morning voted for or agreed to more than $50 per acre for said 360.7 acres or more than $2 per acre damages to the remaining land; that after the jury had returned to the jury room after the noon recess on said day, Mr. Farmer, the foreman of the jury, stated to affiant that he had a way of knowing the value of river bottom land in that part of the country; that he had similar land which was on the market, and that he could get $100 per acre for his land, and said Farmer also showed affiant a typewritten statement which stated in substance that the city of Ft. Worth had paid as high as $75 per acre for land that it had bought for reservoir purposes, and that affiant believed that the statement in said written document was true, and relied on it; that there had been submitted to him no evidence as to what the city had actually paid for lands that it had acquired, and that the statement in said typewritten document caused affiant to agree to a verdict of $75 per acre for said 360.7 acres, and if it had not been for the statement in said written document, affiant would never have agreed to such verdict, and that he now believes that said verdict was excessive, and has always thought so; that affiant is about 50 years of age, had never been on a jury prior to that time, and was unacquainted with the procedure and customs of juries, had been away from his home for considerable time, and was needed at home and was anxious to get off the jury and go back to his home to attend to his work; that the

majority of said jury were of the opinion that said land was worth a great deal more than affiant thought, and that the damages to said upland was a great deal more than affiant thought it was, and that affiant did not realize, and did not calculate, how large a sum of money a verdict of $10 or $15 per acre for damage to the upland would amount to; that some of the jurors tried to get affiant to agree to $10 per acre damage to the upland, and finally agreed to compromise on $9 per acre, and that said Farmer stated to affiant that most any kind of a verdict was better than a hung jury, and that if the city of Ft. Worth did not get justice from the verdict, it had the right to appeal, and that affiant, being unacquainted with court procedure, and believing said statement of said Farmer, finally agreed to the verdict of $9 per acre as damages to the plaintiff's uplands; that affiant at all times believed that said damage was excessive and told the other jurors that he so believed, and still believed so, and that he further told the jurors, and believed and still believes, that the verdict of $75 per acre for the 360.7 acres was excessive, and that if affiant had only heard the evidence, the charge of the court and argument of counsel, he would never have agreed to such verdict."

Upon the hearing of the motion for new trial, the court also heard the testimony, it seems, of some five of the twelve jurors who tried the case. The record discloses long examinations in chief and cross-examinations, but we think the following statement of the evidence upon the hearing of the motion will substantially present the essential facts necessary for our consideration.

W. W. Manning, one of the jurors, among other things, testified as follows:

"Counsel states that after the jury had heard the evidence and the argument of counsel, and the charge of the court, and had retired to consider their verdict, it is alleged that a certain document was read and submitted to certain jurors. To state the facts about that, as I remember it: That document was among the papers when we went in the jury room, and it seems to me the first time it was brought to my notice was in the afternoon. We had discussed the case and voted two or three times. We had considered it all the morning. Mr. Farmer, the foreman, I believe called it to my attention. He had it in his hands when I came in the afternoon. They seemed to have been discussing it, and he made the remark, 'We find here where the city has paid $75 an acre for some land,' and I examined it closely, and I think I called his attention to the fact it said it had not paid in excess of $75, and then, of course, I do not remember all the little details in connection with that paper, but I think I called their attention to the fact that that paper was an answer of some kind in an injunction suit and doubted the propriety of considering it. That paper was not the answer the case went to trial on. I think it was the answer of some kind of an injunction. During that discussion between Farmer and myself, I think the jurors were all present, but I do not know how many of them heard it. I was standing right close to them at the time it was first mentioned, when he was first examining it and later on I read it with more detail. I have stated my recollection of the contents of that document on that particular feature; it went into quite a few details as to some kind of agreement, I believe, made between Davis and Mr. Young. I did not read the instrument clear through. Further than that particular discussion I do not remember that I heard any other juror discuss that document. At the time we first went out and first balloted, all of the jurors were not for a verdict of $75 an acre for the 360.7 acres of land

taken; there was quite a difference. I should say there was approximately half of the jurors were for a smaller verdict than that. I do not remember the figures, but I think there was approximately half. I jotted the figures down, we voted in blank, each one put down the figures he thought would justify him for this bottom land, put it into a hat, and then it was called off and the average of $72.50, as I remember about it, on the first ballot. I think the lowest vote on that ballot was $35. The jury had not agreed on their verdict at the time this discussion was had about this document I have just told about; they had not agreed on that feature of it; they had agreed on certain features that were mentioned in the charge, but they had not agreed on the amount of the market value of the 360.7 acres. I do not believe we had taken another vote up to the time of the discussion I have mentioned; there was considerable discussion there, trying to reach a common ground for an agreement. Prior to this discussion I have mentioned my ballot was for $50 an acre for this bottom land. I don't know whether I had or had not agreed to a higher verdict than $50 prior to the time I saw this document. I may have, but I am not certain about that. I do not remember whether we voted again or not, but we discussed the matter and we were trying to reach a common ground, and I think I probably made a suggestion that a lot of us would have to concede from the figures we had, some of the high men had to get down and some of the low men had to get up, and I may have indicated that I was willing to raise my figures a little bit; in fact, I am pretty sure I indicated I would raise my figures to any reasonable basis. I do not think at that time I had agreed to raise my figures to $75 an acre."

Another juror, J. F. Wise, being duly sworn, testified as follows:

"My name is J. F. Wise. I live in Tarrant county, Tex. I will be 50 years old in November. This is my ninth year in Tarrant county. I am a farmer. I was one of the jurors in the trial of this case in the month of April this year. Prior to that time I was never on a jury of any kind before; that was the only jury I was ever on. The jury retired to consider their verdict after hearing the evidence, the charge of the court, and the argument, late one afternoon. I do not think it was turned over to the jury until next morning, and we began the consideration of the case on the morning following the closing of the argument on the evening before. The jury took a ballot as to the market value of the 360.7 acres of land belonging to plaintiff that the city was taking. I could not state at what time in the morning they took the first ballot, but it was not a great while after we went in the jury room. I do not remember exactly about how the jury stood on that ballot. I remember it ranged all the way from $35 to $100, or above that. I do not remember whether it went above $100 or not. On the first ballot I voted $35. I do not remember how many ballots we took on that morning. To the best of my knowledge during the morning session I did not personally agree to more than $50 an acre for the land taken. I do not remember whether we had any agreement during the morning session on the amount to be given for the uplands that were not actually taken; not that I remember of did I agree in the morning session to a verdict of exceeding $2 an acre for the remaining upland. I do not remember that we had any agreement. After the jury had come back from the noon recess this statement (witness indicates the original answer above referred to) was in with these papers that Mr. Farmer had, and he showed it to me and told me he had found this, that he had seen something of that kind and told me what it was and showed me the paper. Farmer

was the foreman. I can explain what statement he made to me: He and I were arguing with each other about my being too low and he too high. I do not remember what he was wanting to give for the bottom land, but there was a right smart difference in us, and I told him my reasons for thinking he was too high, and he was telling me his reasons for thinking I was too low. I do not remember what reasons I gave him, but anyway we were arguing with each other, and when he came back after noon, I suppose he called my attention to the— I had claimed that I had understood the city never had paid that much for land. I heard that, in fact, once, and he went to show me then that it had paid this much; he just called my attention to it being in this statement that they had paid as high as $75 an acre for land in the reservoir site, and he showed me the statement. I did not read any of it hardly, only just that part where it showed that they paid $75.

"Examined by the Court: I reckon that statement was this pleading that Mr. Manning had here; it seemed to be like that, looked like that, had a blue back on it like that. I never paid any particular attention to what it was, only that particular point. I suppose that is it.

"Examined by Mr. Curtis: You ask me if I looked to see the signature to the paper, and I answer: I think, as well as I remember, I do not know the man's initials now, but it was Bowlin written with a pen, I noticed that much. Bowlin signed it. His name was down at the bottom below the typewriting, where Bowlin's name appeared.

"Mr. Flournoy: Q. The question is whether or not, to the best of your knowledge, the paper we had here this morning and which was exhibited to Manning and from which he read that clause about the price was the same one. A. I suppose it was; I have no reason to believe to the contrary.

"Examined by Mr. Curtis: I could not tell you how much of that document I read. I just read it down far enough to catch that part of it was all, that the city paid $75. That is all I remember about it at all. I did not pay any attention to the balance of it. I certainly believed that statement in the document to be true. I certainly considered that statement in the document as evidence in the case. That statement in the document which I believed did have an influence with me in my allowing or agreeing to a higher verdict than I had agreed to or been in favor of prior to that time. To the best of my knowledge, if I had not seen that statement and believed it to be true, I do not think I would have agreed to a verdict of $75 an acre. It was just after the noon hour when I saw this document and my understanding is we agreed on a verdict of $75 an acre for the land, taken about 3 o'clock, agreed on the whole verdict. I think it was about 3 o'clock, as well as I remember; it might have been later than that, some—a little. I do not remember."

The witness, in reply to a question by Mr. Flournoy, of counsel for appellees, replied as follows:

"Q. If you had not seen that paper, or had not heard what Farmer said, are you willing to say to this court you would not, on the evidence in this case, under your oath have given a verdict as you did give it, sooner or later, for that amount? A. For $75, no, sir; I would not. You ask me what makes me say that and I answer that I say I would not if I had not seen this statement; and I say that because I thought it was too high, I thought $75 was too high. I still think it is too high. I thought it was too high after Farmer talked to me, and after I saw that statement. You ask me: Then if it was your original opinion it was too high,

and those statements did not alter that opinion, how can you say that altered your verdict—if they did not change your opinion, how could they affect your verdict? and I answer: They did change my opinion; they changed my opinion in the respect that it caused me to agree to give more than I would have done otherwise; it caused me to do that simply because the statement said they paid more than that."

It was agreed that neither party was responsible for the paper in question getting to the jury. The pleading identified as being one which found its way to the jury during their deliberations was, as stated, an answer filed by the city of Ft. Worth in this cause on the 27th day of October, 1913, and was in the nature of a motion to dissolve an injunction which had been theretofore obtained against the city.

It seems unfortunate that occurrences of the kind thus brought to our attention should ever happen, but by our laws a litigant has a right to a trial by twelve impartial jurors, and the rules for their government are so framed that each and all shall be free from all probative forces except such as may be submitted to them under the rulings of the court. It is specially provided by statute that "any person who has a bias or prejudice in favor of or against either of the parties" is disqualified. Vernon's Sayles' Texas Civil Statutes, article 5117. Again, that "no verdict shall be rendered in any cause except upon the concurrence of all the members of the jury trying the same." Id., article 5217. And after the hearing before the jury is concluded, additional testimony before the verdict can only be submitted to them under the trial court's direction, and where it appears to the court to be necessary to the due administration of justice. See article 1952. And upon the retirement of the jury they may take with them only "the charges and instructions in the cause, the pleadings and any written evidence, except the depositions of the witnesses." Article 1957. It is further provided, with certain exceptions not necessary to notice, that after the retirement of the jury they shall be kept together under the charge of an officer who "shall not suffer any communication to be made to them or make any himself except to ask them if they have agreed upon a verdict, unless by order of the court," etc. See articles 1958 and 1959. Other provisions of our statutes looking to the same end may be found, all, as stated indicating the jealousy with which the law guards the deliberations of a jury, and the precautions taken to give assurances that the verdict is uninfluenced by forbidden or unauthorized communications. Under article 1957, supra, specifying what a jury may take with them in their retirement, it has been held: That it was prejudicial error to permit the jury to receive after retirement a book not offered in evidence. Goar v. Thompson, 19 Tex. Civ. App. 330, 47 S. W. 61. That a jury erred in deciding to take with them an original

petition in the case which had not been used as evidence upon the trial. Hall v. Cook, 117 S. W. 449. That it was prejudicial error for the jury to take with them and consider a memorandum used by a witness to refresh his memory. Faver v. Bowers, 33 S. W. 131. See, also, Wiggs v. S. W. Telegraph & Telephone Co., 110 S. W. 180. Illustrations of the character given might be multiplied, but we deem it unnecessary.

It is not contended that the answer of the city described in the testimony of the witnesses Manning and Wise was such an instrument as the jury were authorized to take with them. Indeed, appellees substantially so admit. So that, as it seems to us, it only remains to be determined whether or not the error was such as requires of us a reversal of the judgment.

It is evident from the testimony given that the Juror Wise, at least, was influenced by a consideration of the instrument. He was one of the low men upon the jury. It was exhibited to him by the foreman, one of the high men. Until the consideration of that instrument, the Juror Wise states that he had not agreed to a verdict of more than $50 per acre as damages for the lowland. He says:

"Up until the time I saw this statement in there, that they had paid $75 per acre, I was opposed to the verdict."

While some suggestion it appears was made that the instrument was such as they were not authorized to consider, the Juror Wise answered that:

"Anything that the court would allow us to have in the jury room I thought was perfectly right we should consider."

He again says:

"I certainly considered that statement in the document as evidence in the case. That statement in the document which I believed did have an influence with me in my allowing or agreeing to a higher verdict than I had agreed to or been in favor of prior to that time. To the best of my knowledge if I had not seen that statement and believed it to be true, I do not think that I would have agreed to a verdict of $75 per acre."

The Court of Appeals for the Fifth District reversed a judgment where it had been made to appear that a single juror received testimony from a secret and unlawful source. Andrews Lumber Co. v. M., K. & T. Ry. Co., 158 S. W. 1194. It was there said:

"The decisions, however, do not place the interference by the courts with jury verdicts upon the ground that the juror has received testimony from a secret and unlawful source which tends to dispute and contradict the facts introduced by either litigant in a lawful manner upon the trial, but, on the contrary, places it upon the high ground that all litigants are entitled to a fair and impartial trial by jury and that essentially and in the very nature of things, a juror who does not recognize the impropriety of discussing the merits or demerits of the case, in which he had been sworn as a juror with witness or litigant, is in no sense a fair or impartial juror."

It was further said in that case that:

"It is perhaps often true that such discussion has no effect on the juror; in fact there is in the instant case nothing to show that the juror was affected by what Bates said, or influenced the other jurors. Indeed, the juror has declared the discussions had no influence with him; but such facts and claims are material, if at all, in rare cases, since, as forcibly said in one of the cases cited below, if a practice of this character was permitted to go unchallenged, it would be difficult to draw the line and say when it should cease, and the best practice to pursue is to prevent it altogether. It is impossible in cases where questions of this kind arise to determine whether harm or improper influence resulted, and an effort to ascertain the truth in that respect would be altogether speculative."

In the case of G., C. & S. F. Ry. Co. v. McKinnell, 171 S. W. 1091, this court reversed a judgment because of a showing that certain jurors in the personal injury action agreed to a verdict for a larger amount upon the statement and argument of other jurors that the appellee would be required to pay some $1,500 to $2,500 for attorney's fees. It was held, in effect, that the argument of the jurors injected into the consideration of the jury a fact that had not been proven, and which under the circumstances was probably prejudicial.

So, in Hobrecht v. S. A. & A. P. Ry. Co., 141 S. W. 579, the widow and children of Alvin Hobrecht sued the railway company to recover damages for the death of the husband and father. It was shown that the deceased was run over by a train belonging to the railway company at night, and it was material to determine whether the engineer operating the train could, by an exercise of proper diligence, have stopped his train earlier than he did. It was shown in behalf of the plaintiffs in the suit that the track at the time was dry, and the train equipped with air brakes, and running at the rate of 6 or 8 miles an hour, and that under such circumstances the train could have been stopped within 100 feet, at which distance the evidence shows the engineer saw Hobrecht. After the retirement of the jury, one of the jurors stated that he had had experience as a railroad fireman, and knew that the track was wet at night, and that the engineer could not stop the train any sooner than he did. It was held that the improper introduction and consideration of such statement required a reversal of the judgment in the railway company's favor.

In the case of Yanez v. Traction Co., 126 S. W. 1176, by the Court of Appeals for the Fourth District, it was held that the statement by the juror in the jury room while the jury were deliberating in an action against the street car company, that he had been told, and it was generally known at a certain place, that plaintiff was injured while stealing a ride on the rear of the car, was improper and a ground for a new trial, though two of the jurors testified that they were not influenced thereby. See, also, Revised Statutes, article 1957; Hall v. Cook, supra; Green v.

Hill, 4 Tex. 465; McLeod v. Humeston & S. Ry. Co., 71 Iowa, 138, 32 N. W. 246; 29 Cyc. pp. 808 and 810, and authorities there cited.

[2] It is true, as appellee insists, that rulings of the character here under consideration are largely left within the discretion of the trial court, but such discretion is not an arbitrary one and beyond the revision of the appellate tribunal, as is very clearly demonstrated by the cases before cited. It may be that we would not feel willing to go quite so far as some of the cited cases have gone, but we certainly think, under the circumstances here appearing, that we would be recreant to the duty resting upon us as a revisory power to approve the ruling of the trial court now under consideration.

We deem it unnecessary to discuss any other question presented, but for the error above noted, it is ordered that the judgment be reversed, and the cause remanded for a new trial.